[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff commenced this action, in three counts, claiming in the first count an inverse condemnation, in the second count fraudulent misrepresentation, and in the third count negligent misrepresentation.
This action arises out of activities in connection with a redevelopment project known as Park/Squire/Wolcott project in the city of Hartford. The defendant was the owner of a piece and parcel of real estate, one section of which was bounded on the north by Park Street. The second section was bounded on the east by Squire Street.
The Park Street section at one time had a commercial CT Page 306-A building on it, fronting on Park Street. The Squire Street section had a six unit apartment building, fronting on Squire Street. As a single property this real estate was in the shape of an "L". At a point in time, as will be later discussed, the property was divided into two parcels by extending the north boundary of the Squire Street section in a westerly direction to the west boundary of the property. The two sections of the L were thereby divided into their respective rectangles, the base of the L becoming the residential section of Squire Street and the altitude (vertical) becoming the Park Street business property.
I. THE REDEVELOPMENT PLAN
The first three pages of the defendant's brief summarizes the project and is hence incorporated herein.
"The Hartford Redevelopment Agency (the "Agency") was created pursuant to the Redevelopment Act, C.G.S. Chapter 130. Members of a redevelopment agency are appointed by the chief executive of the municipality, with the approval of the legislative body, and serve for a given term. The members serve without compensation but may be reimbursed for necessary expenses. C.G.S. § 8-126 (a). CT Page 306-B
The Redevelopment Act authorizes redevelopment agencies to prepare redevelopment plans, to acquire property within redevelopment areas, and dispose of property within redevelopment areas to redevelopers, C.G.S. §§ 8-127, 8-128, 8-137,see Gohld Realty Co. v. Hartford, 141 Conn. 135 (1954). Redevelopment agencies are also empowered to issue bonds and accept grants and other financial assistance in order to carry out a redevelopment project. C.G.S. §§ 8-134, 8-135.
Unlike the statute governing boards of education, the Redevelopment Act does not have redevelopment agencies acting as agents of the State. Compare C.G.S. § 10-1 et seq. with
C.G.S. § 8-124. The Redevelopment Act also calls for a municipality to approve certain agency undertakings, and authorizes a municipality to appropriate funds to the agency. C.G.S. §§ 8-127, 8-134, 8-137. However, only a redevelopment agency can carry out a redevelopment project. For example, only a redevelopment agency can choose a redeveloper or dispose of redevelopment property. C.G.S. § 8-137.
The City of Hartford, as required by the Redevelopment Act, adopted the provisions of the Act by ordinance, thereby establishing a redevelopment agency for Hartford. Hartford Code § 28-66. The City, also by ordinance, provided that the CT Page 306-C Agency, "is designated and constituted to carry out the purpose of the Redevelopment Act." Hartford Code § 28-68.
The Redevelopment Agency approved the "Redevelopment Plan for the Park/Squire/Wolcott Street Project" (the "Plan" or the "Redevelopment Plan") on February 15, 1990. It was amended by the Agency on July 19, 1990. The Hartford City Council approved the Plan on September 14, 1990, completing the statutory procedure for plan adoption. C.G.S. § 8-127.
The Plan encompasses about 1.74 acres of land, an area which was, at the time of Plan adoption, deteriorated and which had buildings "in various stages of deterioration." The neighborhood, according to the Plan Introduction, "has over an extended period of time, remained largely neglected. . . ." The Plan calls for the development of housing on both Park and Squire Streets and the construction of a retail/commercial development on Park Street.
The Plan provided for the acquisition of eleven (11) parcels of privately-owned land, on Squire, Park and Wolcott Streets. The Plan provided that if property owners complied with certain criteria, their properties would not be acquired. In order not to be acquired, a property owner would have to, within one hundred-eighty days of the Agency's Preliminary CT Page 306-D Acquisition Notice, accomplish the following: 1) plans for new construction and/or rehabilitation would have to be approved by the City's Planning Department, and 2) evidence of financial resources sufficient to complete the proposed construction would have to be submitted to the Agency. (Thedefendant's brief omits the fact that to be excluded from thePlan requires the Agency's approval).
The Plan provided for the relocation of residents and businesses. It also set forth certain specific controls on land use and buildings. These included the requirement that new structures not be greater than four (4) nor less than two (2) stories in height. With regard to financing, the Plan says the following:
 "The. . . Project activities will be financed through the City of Hartford's Community development Block Grant Program. These activities include acquisition, relocation, property management, demolition, and other incidental expenses included by the Agency prior to land disposition."
"The Plan includes no authorization for the Agency to provide financing to redevelopers. The Plan has a duration of thirty (30) years." CT Page 306-E
II. THE CETINO PROPERTY
Mr. Citino had purchased the property as a single parcel, by a single description, on May 24, 1985 from a Mr. Strough and a Mr. Conway, described as residents of Florida. Thereafter both of the structures, Park Street and Squire Street, suffered major fires. Park Street was demolished. Squire Street ceased to be inhabited.
The redevelopment project was under consideration during the year 1989, prior to its official adoption.
The plan, as adopted, included eleven properties. Both the plaintiff's Squire Street property and his Park Street property were included in the plan. The four Squire Street property designated to be acquired consisted of four apartment houses. The plaintiff's Squire Street property is the second apartment building on Squire Street, running south from Park Street, there being two other apartment buildings immediately south of the plaintiff's apartment building, and one apartment building immediately north of the plaintiff's apartment building.
The plaintiff's Park Street property was bounded on the CT Page 306-F west, on Park Street, by three adjacent business properties, also to be acquired. It was bounded on the east by a residential building, that being the aforesaid building which borders the plaintiff's Squire Street property on the north.
The project itself consists of redeveloping part of the city block which is bordered on the north by Park Street, on the east by Squire Street, on the south by Ward Street and on the west by Wolcott Street. The property to be taken consists of the north and west one-half of Squire Street, the entirety of Park Street between Squire and Wolcott Street, and the north and east one-third of Wolcott Street. Hence, the configuration is a contiguous group of properties, being somewhat less than the north half of the four street block.
The plan describes the redevelopment area as: "It is a deteriorated area of approximately 1.74 acres of land, some of which is vacant. The buildings in the project area are in various stages of deterioration. Several are vacant, boarded up and in poor condition."
The court viewed the site at the request of and in the presence of both of the parties. The physical description of the area to be taken, as above described, would aptly describe the entire block, including that area of the block which is CT Page 306-G not designated to be taken under the Plan.
The Redevelopment Plan provides for site acquisition, management, some demolition, and the turning over of the property to "one or more developers" to accomplish the redevelopment plan.
III. CONTROLS, AND PROVISIONS FOR EXCLUSION
The plan provides that ". . . the agency may sell land to redevelopers at minimal cost to accomplish the objectives of the Plan."
The Plan also sets forth ten pages of strict requirements and controls for construction and use of the redevelopment property. These controls remain effective for thirty years. Although the developer(s) can sell the developed property, any purchaser is bound by the restrictions for thirty years.
The project further requires that at least 51 percent of the units rehabilitated and/or created in the project will be occupied by low or moderate income households, defined as those households whose incomes are below the Section 8 Public Assistance limit.
The plan, as adopted, further allows CT Page 306-H
 "The owners of properties shown as "to be acquired" may request the agency to consider a change of designation to "not to be acquired" provided the following activities are completed within 180 days of the Agency's Preliminary Acquisition Notice:
 1. Plans for new construction and/or rehabilitation have been approved by the Planning Department.
 2. The evidence of financial resources sufficient to complete the proposed construction is presented to the Agency.
 3. Construction shall start no later than thirty days following the Agency's acceptance and approval of items 1 and 2.
(Emphasis added)
The court, sua sponte, questioned the wisdom of this removal provision and was informed by the defendant that this provision was not in fact good planning for a redevelopment project. CT Page 306-I
On March 19, 1992, after the events to be hereafter described, the Agency then adopted a resolution giving preference to "former Project property owners . . . in its selection of redevelopers for the Park-Squire project." The plaintiff has never been afforded any of the benefits, financial and otherwise, of being a redeveloper for the Squire Street property, which he has completely renovated. The problems attendant thereto should be obvious. (Only one other designated property, a residential property on Wolcott Street owned by the Hartford Housing Authority, a public agency, has been in some fashion excluded from the Plan).
IV. RECONSTRUCTION OF THE SQUIRE STREET PROPERTY
On October 30, 1990, after the Plan had been adopted, the defendant was served with an anti-blight citation by the City of Hartford as concerned 17-19 Squire Street. The citation levied a fine of $17,820 against the plaintiff. The plaintiff appealed the citation. Why the plaintiff's property should have been cited, bearing in mind the general deterioration of other properties in the neighborhood, has not been explained to the court.
At that time the plaintiff was interested in CT Page 306-J renovating/constructing both 17-19 Squire Street and 457-469 Park Street. He would not at that time have been entitled to a preference as a developer, as would subsequently have been the case under the resolution which was later to be passed, on March 19, 1992. The plaintiff claims that he was not interested in only doing the 17-19 Squire Street without also doing the 457-469 Park Street commercial property. The court credits this testimony.
Mr. Nicholas Fusco testified at the request of the plaintiff. Mr. Fusco is a certified public accountant, later to become a City of Hartford councilman. He went with the plaintiff to the Redevelopment Department, in his professional capacity as a CPA. Mr. Citino made it very clear at that meeting that he was not interested in doing Squire Street unless he could also do Park Street. The meeting, as he recalls it, was to discuss both parcels. Mr. Sinclair and Ms. Colon, Redevelopment officials, were in attendance.
Mr. Fusco recalls that there was an understanding that if the plaintiff did Squire Street that he would have to go through the process of "whatever it is," but that he would be able to remove and renovate his commercial parcel on Park Street so long as it was consistent with the redevelopment plan and met the criteria. He felt it was made very clear to CT Page 306-K the defendant that Squire Street would not be done without Park Street.
The plaintiff claims that he was led to believe by the defendant that if he rehabilitated Squire Street he would be allowed to retain and renovate the Park Street property. He also alleges that the defendant led him to believe that it would make available to him sufficient funds to accomplish the development of the Park Street property.
The court finds, however, that the plaintiff was never given assurance that he would be allowed to develop the Park Street property. Although he and others may have been told, informally, that there was money available for the redevelopment project, no specific commitment had been given to him that whatever plans he decided to submit would be approved or, more important, the he would be given approval without the obtaining of adequate financing.
Although any statement that there was the funding for the project may be generally accurate, in a general sense of that phrase, such statement would be far too general and superficial to be a basis for absolute reliance upon which to base a significant financial undertaking.
The defendant, by law, can expend its own funds only for CT Page 306-L the purpose of acquisition, relocation of tenants, management, and some site preparation. It cannot expend its funds for actual construction or renovation. Other public funds from other agencies may be available for construction assistance, such as housing funds from governmental housing agencies. However, the allocation of such funds are not the purview of the defendant Redevelopment Agency.
As it turned out, one agency, the Department of Development and Community Affairs could make available $300,000 to $400,000 to help with any potential development of the Park Street property by the plaintiff. But this would have required additional private funds of approximately $600,000 to accomplish the basic reconstruction plan which the plaintiff had submitted for Park Street.
Although the plaintiff asserts that his plans for Park Street were improperly rejected on the basis of being incomplete, showing only one floor rather than the multi-floor construction required by the agency, yet that would have made no difference, as the plaintiff was unable to acquire the necessary private funding for whatever construction would be required for Park Street.
V. FUNDING FOR PRIVATE OWNERS
CT Page 306-M
The plaintiff had been advised at an early time that in order to exclude Park Street from property to be acquired, plans would have to be approved and further that "evidence of financial resources sufficient to complete the proposed construction" was required.
The plaintiff embarked upon the renovation of Squire Street on the mistaken belief that if that was completed he would be allowed to construct Park Street. He also thought that he had a commitment for funding for Park Street. Neither of these beliefs were accurate, although they were honestly held by the plaintiff.
The plaintiff, when he was discussing with the agency his proposal to develop Park Street and Squire Street as a unified project, so to speak, had been told by Mr. Greenwald, executive of the Redevelopment Agency that "we have plenty of money to do this project." Mr. Citino believed that this applied to both Park Street and Squire Street although, in retrospect, the statement was for all practical purposes only applicable to Squire Street and was so limited by Mr. Greenwald.
Squire Street was in fact able to be funded through CT Page 306-N various housing fund loans available through the public sector including the City of Hartford and the Capitol Housing Finance Corporation. The availability of those funds for that project caused the plaintiff to believe, though mistakenly, that adequate funding would be available to do Park Street. Simultaneously the City of Hartford was putting additional pressure upon the plaintiff to renovate the Squire Street building, under threat of very substantial fines, which pressure was unwarranted, as the building was a part and parcel of the designated redevelopment area scheduled for public acquisition and redevelopment.
Consequently the plaintiff, in reliance on that mistaken belief, and in response to the assessing of fines by the City, did reconstruct the Squire Street property, thereby incurring mortgage obligations of $248,500.00.
The court finds that the defendant's limited statement as to funding, though properly related to Squire Street, did not specifically relate to Park Street. The court finds that there was no actual misrepresentation on the part of the defendant. Hence, the court finds for the defendant on the misrepresentation counts, count two and count three. This finding does not, however, end the inquiry as to the plaintiff's claims in this action. CT Page 306-O
THE EQUITABLE CLAIMS OF THE PLAINTIFF
The court now addresses the first count of the complaint. The first count sets forth a claim which is generally described under the category of "inverse condemnation."
The factual pattern of the within case does not fit squarely into the pattern of those cases wherein the courts have determined that inverse condemnation has taken place.
The leading case of Laurel, Inc. v. State, 169 Conn. 195
(1975) sets forth the basic criteria as concerns inverse condemnation.
 "Where a portion or a parcel is taken and the remainder of the land is not taken, either by rights of statutory authority or in a constitutional sense, the owner has no direct cause of action against the condemnor but is left to recover any severance damage under the provisions of General Statutes 13a-76."
 Laurel, Inc. v. State, supra p. 202.
"There is, however, no confiscation of property in the CT Page 306-P constitutional sense unless the property cannot be utilized for any reasonable and proper purpose."
Laurel, Inc. v. State, supra, p. 201.
The Laurel, Inc. case involved a situation whereby part of the land was taken, thereby eliminating the access to a road which would have provided access to the property upon which the plaintiff was in the process of constructing a 103 unit condominium complex under a conditional permit from the town of Fairfield. The Supreme Court held that because the property was able to be used for residential use, as was available in the underlying R-3 district, with street access for such less intense use, there was no inverse condemnation taking of the land. The Supreme Court was careful to note, however, that actual losses may be considered under the relief of "severance damages," which conceivably may include damage for the loss of the specific permit use, under the criteria ofBudney v. Ives, 156 Conn. 83. See Laurel, Inc. v. State,
supra, p. 204.
The plaintiff does not claim in this action that he was not compensated for the taking of the Park Street property. When that property was condemned he received by judicial award the fair market value of that property and any severance CT Page 306-Q damage which would be appropriate to compensate taking of the Park Street property. Superior Court. J.D. Hartford-New Britain, Case #512206, Decision April 25, 1994.
In recent years significant questions have arisen as to the right to compensation for persons who own property in blighted areas, where redevelopment projects have been initiated, but where the particular property owner's property has not been included in the perimeters of the area to be condemned. Problems of this nature usually arise in circumstances whereby marginal properties are excluded from the dimensions of the redevelopment project, and which properties sustain diminished marketability due to the disruption caused by, and inherent in such redevelopment projects. However, absent actual condemnation of the property, most courts have not recognized either the failure to condemn, or the effect of pre-condemnation procedures which may diminish marketability, as a proper element of damages if the property is not later condemned.
A. DECLARATIONS OF BLIGHT
See Nichols on Eminent Domain, Revised Third Edition,
1966, Volume 2A, Sec. 6:14(1), P 6-239, 6-240. "A declaration of blight is one of the early steps in a urban renewal project CT Page 306-R . . . . From the time it becomes generally known that an area has been selected as the sight of an urban renewal project, as we have pointed in earlier cases cited above, there ceases to be a ready market for premises within the area. It becomes difficult to find tenants and impossible to enter into long-term leases. Upkeep, maintenance and renovation cease and the value of the property tends constantly to diminish.
. . . This contrast between the unfortunate plight of the owner whose property has suffered the consequences of the declaration of blight, but has not been condemned, and the relatively fair treatment accorded a neighboring owner whose property has in fact been taken, strongly suggests that the former has been arbitrary and unfair."
B. ABANDONMENT
The fact pattern in the present case presents a different set of circumstances. Here the plaintiff's property was actually physically located in the physical redevelopment area. He does not claim that the property was arbitrarily excluded from the redevelopment area in the first instance.
The plaintiff cites the case of Washington Market, Inc.v. City of Trenton, 343 A.2d 408 (1975) for the proposition CT Page 306-S that an inverse condemnation may take place if a redevelopment project is proposed, which will include a subject property, and the Redevelopment Project is later abandoned then the damage which has been suffered by the property owner in the interim may in fact be compensable. In that case, WashingtonMarket, Inc., the area was declared blighted in 1967. The program called for periodic condemnation of property. The therein plaintiff's property would have been one of the last taken. In 1972, fifteen years later the project was officially abandoned. Neighborhood properties had been acquired and, as expected, had deteriorated. The effect upon that plaintiff's property was catastrophic, income decreasing from $160,000 per year in 1963 to $6,300 in 1973, at which time the building was "for the most part vacant." See also
General Statutes § 48-17a concerning abandonment.
In the present case there has been no formal abandonment
of the redevelopment project. The plaintiff's Park Street property was taken by condemnation on February 20, 1992. The properties adjacent to the plaintiff's Squire Street properties were purchased by the defendant from February 1972 through May 1972 in amounts ranging from $144,000 to $181,000.
The plaintiff's property is in the middle of those acquired properties on Squire Street.
The defendant, in furtherance of the project, sought bids CT Page 306-T for persons interested in being redevelopers for the project. Three entities picked up bid forms. Only one, a combined venture, LaCasa de Puerto Rico, Inc. — Broad Park Development Corp., submitted a bid. This is not particularly surprising for a project of this nature, bearing in mind that the plan's built in limits on residential rental charges would obviously not make the project attractive to the commercial private enterprise sector.
The process has been slow indeed. Four years has passed since the developer submitted the proposal in December 1992. Issues have arisen concerning the details of the project. Some members of the Agency have expressed frustration with the slow progress. Recently, as the date for this case approached, significant activity has taken place including applications to various commissions. Significant steps, including placing the project out to bid, selection of the general contractor, and, lastly, submission to the Bond Commission are scheduled to take place in early 1997. Submission to the Bond Commission is targeted for April 1997. This latter step is absolutely necessary, as the physical reconstruction activity requires approval and funding through the State Bond Commission. The project is still "in the pipeline," as the approval of the Bond Commission is necessary for the funding. Naturally the result of that submission to CT Page 306-U the Bond Commission cannot be predicted.
Unlike Washington Market Ent. Inc. v. City of Trenton,
supra, this project has not been abandoned. The court cannot, however, predict, one way or the other, whether, or at which point in time the project will actually come to fruition so as to physically develop the redevelopment property. The project has not been "abandoned" as of this time.
B. THE NEED FOR PUBLIC SUBSIDY
As can be readily seen from the above conclusions and from the multitude of documents submitted to this court, projects of this nature for redevelopment of blighted neighborhoods in the inner cities cannot realistically be accomplished without financial subsidy by the public sector. And they cannot be accomplished without the actual cooperation and coordination of the various governmental agencies whose assistance is required to make such a project viable.
An example in point concerning public sector subsidy is the financial involvement of the defendant Redevelopment Agency. The court, sua sponte, inquired as to how the Agency is to recapture the substantial funds which are expended by the Agency to acquire and make ready the property for CT Page 306-V redevelopment construction. The answer is, and the fact is, that the property is turned over to the developer at no cost, or at nominal cost, to the developer. This subsidy is allowed as a proper expenditure of public funds in the public interest.
The court notes that in March 1992, after the plaintiff had rehabilitated the Squire Street property, the agency passed a resolution giving preference to "former Project property owners . . . in its selection of redevelopers." Had the Redevelopment Agency used this approach in dealing with Mr. Citino it would have purchased the Squire Street property from him, returned it to him free of cost, and the funds returned to him would have provided a significant subsidy so that his renovation of the Squire Street property would have a chance of being economically sensible. Rather than to do that the defendant encouraged or at very least allowed him to carry the entire burden of redevelopment of the Squire Street property, which inevitably had to turn out to be an economic disaster for Mr. Citino.
The defendant Redevelopment Agency has moved out all of the tenants of the adjacent buildings. Those buildings are now vacant and forlorn. The buildings are boarded up and the land is strewn with litter. The defendant or the City's CT Page 306-W purchasing department has turned over the "management" of the acquired property to LaCasa de Puerto Rico, the prospective developer. LaCasa is paid $1,200 per month to manage the property, which sum cannot realistically be expected to provide adequate supervision to prevent further deterioration of the project property.
The plaintiff's property now stands by itself, rehabilitated to the satisfaction of everyone, in the midst of the deteriorated and boarded-up neighboring buildings owned by the defendant. The court, upon inspection at the request of and in the company of both parties, observes that the plaintiff's building has been well renovated with modern and updated mechanicals, appliances, and the like. The defendant does not contest the fact that the building was completely renovated in a very satisfactory fashion.
Notwithstanding the fact that the building is for all intents and purposes the equivalent of new construction, the best that the plaintiff can achieve is to obtain rent for twoof the six apartments, at the actual rent of $450.00 permonth. Although five apartments are occupied, three have not been paying the rent and the plaintiff is trying to evict these people. A caretaker for the plaintiff is on the premises and he does a very good job in exchange for the rent CT Page 306-X charge of his apartment, which is customary, necessary, and economically appropriate to maintain the premises.
The court finds that the plaintiff has made a significant effort to rent and to maintain the premises. The court also finds that the inability to attract and retain good tenants is to a very substantial degree due to the emotionally debilitating prospect of living in the midst of the deteriorated and boarded up redevelopment area. The circumstances are best illustrated by the testimony of Mr. Citino — "One apartment has about seventeen people living there. I called the police." Q. "Have they paid rent?" Answer. "No."
The court finds that the prospect of this building, under these circumstances, having any realistic value in the private market is in fact non-existent. This will not change even if the redevelopment project is completed, as the projected economic rent for the redevelopment buildings simply cannot carry this building or other buildings unless substantial public subsidy is devoted to the reconstruction endeavor.
C. THE ABSENCE OF PUBLIC SUBSIDY
The economic circumstances are as follows. The plaintiff CT Page 306-Y secured three loans from various public sector lenders. The defendant argues that the plaintiff has no financial loss or jeopardy, as the loans are from public agencies. However, this is not so. Each of the mortgage notes are signed by the plaintiff personally. None of the loans are non-recourse loans, nor are they limited to the value of the security.
The loans total $248,500. The largest loan is a loan from Capitol Housing Finance Corporation for $129,300, payable in installments over the course of construction. Although the plaintiff appears to testify that the loan did not include the value of his services, as he and his son did all the work, the court does not credit that testimony. The replacement cost approach utilized by the plaintiff's appraiser for the building, excluding exterior walls, which in fact remained intact, amounts to approximately $207,000, and with local and cost multipliers amounts to approximately $231,500. The construction loan would have included labor costs. When the fact of some additional labor costs for interior removal is taken into consideration and considered as an additional expenditure, the figure of $248,500, labor and materials, appears to be realistic. No breakdown of materials or the like were furnished to this court. The court concludes that the total cost of the building renovations including labor would reasonably be approximately $248,500.00. CT Page 306-Z
The plaintiff, in addition to his optimism that he could develop Park Street, was caught in the middle of a more pressing dilemma. The City of Hartford cited the building for anti-blight, and on November 2, 1990 the City was levying an anti-blight fine of $17,820.00. Why this building would have been so cited, where there are so many other buildings in a similar condition in the City of Hartford, and in the neighborhood, is not explained to the court. The plaintiff was told by the City that if he demolished the building he would have to post a bond of $108,000, to be forfeited if he did not replace the building within 18 months. Yet he was also told by the City that he could not demolish the building because it was in a historic district. No reason is given as to the lack of coordination between these public agencies so as to create this type of dilemma.
Although Mr. Sinclair of the Redevelopment Agency testified in this proceeding that "to the best of my knowledge is that if that property was cited and had some violations on it, some type of request, I guess, would have to be put forth for those to be dropped." This testimony is nebulous, at best. No one told Mr. Citino of this prospect. He believed that he had no real choice but to borrow the money to reconstruct the property. He was not told by anyone that if CT Page 306-AA he did nothing, and let the property be condemned, that the fine of almost $18,000 would be dropped.
D. THE VALUE OF THE PROPERTY
The value of the property, both now, and in 1992 after the reconstruction, is a matter of significant dispute yet the result is the same. The defendant's appraiser, Mr. Italia, using the sales comparison approach, testified that the market value at that time, as renovated in 1990, was only $150,000.
As of May 1, 1996 he testified that because of the severely declining market the property, by market value comparison, is now worth $75,000.
Using the income capitalization approach he testified that in 1992 the property was valued at $160,000, and in 1996 at $75,000. The basis for this decrease, using this approach, which is generally thought to be the most reliable approach for income producing property in other than an increasing market is fully explained.
In 1992 market rent was $575 for this type of property, per unit, and in 1996 it is now $500.
Mr. Italia gave a very detailed analysis of the reasons CT Page 306-BB for the decline in market value, driven by market rent, including the fact that Public Assistance vouchers from Hartford, once usable only in the City of Hartford and only for specific buildings, are now the property of the assistance recipients. Given this option, many low income citizens are now choosing to live in surrounding towns rather than in Hartford. Hence there is a surplus of rental units in Hartford. For a further elaboration of these types of problems see the recent Supreme Court case of Sheff v.O'Neill.
The market comparison approach also substantiates these low values in 1992 and in 1996 as testified to by Mr. Italia.
Mr. Marselle, testifying for the plaintiff, testified as to the present value of the property. Utilizing three sales outside of the vicinity of the redevelopment area, which sales were $90,000, $95,000 and $119,920, he concluded that the present value of the plaintiff's property is $50,000 without redevelopment. Using the cost approach for the building, and income approach for the land, he testified that had the redevelopment project been completed, ie had taken place, the present value of the property would be $288,000, consisting of $258,000 for the building and $30,000 for the land. The fallacy of using the cost approach to determine CT Page 306-CC realistic market value is that no objective commercial person operating in a free market would expend this sum of money to construct or to acquire a property which would fall so far short of even breaking even.
The difficulty of trying to apply the income approach to determine market value the property, land and building combined, would be rents which would be required to support a figure of $288,000 are simply unattainable for this type of structure in the City of Hartford. If proper market rents, which is the basis which investors-landlords use, and must use in determining what to pay, were in the vicinity of $575 per unit in 1992, there could be no financial sense or reason for a buyer to pay $288,000 for this property. Such optimistic rents would generate a maximum value of $150,000 in 1992.
The project itself is projecting rents for two bedroom units at $425 per month. This is understandable as so much of the project is designed to produce affordable units for persons of very modest means. Market rents for comparable neighborhood property are naturally driven by neighborhood rents. There is simply no way that this building, even with the completion of the project, could ever hope to generate anything near a market value of $288,000.
The court finds that the present market value of the CT Page 306-DD building is between $50,000 and $75,000. The court finds that with completed Redevelopment of the area the value may increase. However, even if that value were to double to $100,000 or $150,000, which is highly improbable, it would still not come close to the necessary and realistic cost expended by the plaintiff to reconstruct the Squire Street property.
For all intents and purposes this building has no actual economic value now. The rents cannot come close to covering the costs of the mortgages, let alone the value of the investment, which must include he added value of the land. Even with a fully completed redevelopment of the project the building cannot and will not be able to support its cost of renovation. The building has one value and one value only, and that is as an asset to the Redevelopment Agency as an important part of the redevelopment project. As the matter now stands, the building, not being subject to the restrictions of the plan, has the prospect of being a problem for the Agency. Conversely, in the hands of a private owner, the building owner has no right to insist that the redevelopment buildings, when completed, adhere to the restrictions which operate to the benefit of each redevelopment property through covenants which run with the land. The present circumstances, for both the owner and the CT Page 306-EE Agency are totally inappropriate and inconsistent with the entire concept of the Redevelopment Plan.
E. THE FORMAL STATUS OF THE PROPERTY
The court notes that this property, 17-19 Squire Street, has never been formally removed form the Redevelopment Plan. The Plan allows property to be removed by the request of the owner provided:
 "1) Plans for new construction and/or rehabilitation have been approved by the Planning Department.
 2) That evidence of financial resources sufficient to complete the proposed construction, is presented to the Agency.
 3) Construction shall start no later than thirty days following the Agency's acceptance and approval of items 1 and 2." (Emphasis added)
No minutes of meetings or other documentation constituting formal approval to exclude this property has been submitted to the court. Mr. Citino was never asked to submit any plans to the Agency. All of the work was accomplished in CT Page 306-FF coordination with and in response to a citation issued by the City of Hartford under threat of a fine of $17,820. The work was overseen by the City inspector. There was no application made to the Agency, nor requested by the agency, nor was any resolution passed by the Agency, nor was any notice of approval of removal from the plan ever sent to the plaintiff.
The plaintiff was not given the opportunity to thereafter participate as a developer as to 17-19 Squire Street when that amendment to the Plan took place in 1992. Had that been accomplished there is at least a chance that by the Agency making payment to the plaintiff for the pre-construction value of the property, there would be some subsidy to the plaintiff, conceivably causing the reconstruction to have at least some remote chance of being an economically feasible arrangement. This was not done. By Mr. Marselle's calculation the value of the exterior walls, which remained substantially intact, and land, would have been approximately $150,000, which is in the range of values paid to adjacent owners.
Although the property can be utilized in a physical sense
for housing people, yet the value of the property, $50,000 to $75,000 per the appraisals, as against the construction costs of $248,500 causes the property to be realistically economically useless. But see Laurel, Inc. v. State, supra. CT Page 306-GG Because the building does have some physical use for a purpose permitted in the underlying zone it would not fall into the classic definition of inverse condemnation.
The facts presented by this case are significantly different than the factual scenario of the numerous cases called to the attention of this court as concerns inverse condemnation. Other cases involve passive non-involvement of the property owner, who thereafter claims that the condemnation actively decreased the pre-development plan value of property. See Nichols on Eminent Domain, supra. Hence the cases are not directly in point.
F. THE BENEFIT CONFERRED
The present case is in effect one of first impression. The distinction in this case is that the property owner, with full knowledge and encouragement of the agency, and certainly in furtherance of the Redevelopment Plan, accomplished precisely what the Plan calls for. He has redeveloped the property in accordance with the plan, only to find that he must sustain all loss for what was accomplished in accordance with and in furtherance of the Plan, all to the advantage of no one but the Redevelopment Agency.
Whether the plaintiff's plight falls within the CT Page 306-HH traditional boundaries of the term "inverse condemnation" is unimportant. The very concept of inverse condemnation, regardless of its title, arises not at law but in equity.
 "It is clear that if there is a constitutional taking of property by the condemning authority and if there is no statutory provision for the awarding of damages, the court does have jurisdiction to determine the plaintiff's remedy." Laurel, Inc. v. State, supra 200 (emphasis added).
 ". . . it is a clear principle of natural equity. . . "
 Hooker v. The New Haven and Northampton Company, 14 Conn. 146, 159 (1840).
 "No argument has been offered against the equitable remedy to which the petitioners have seen fit to appeal, and we can have no doubt that it is appropriately sought."
 Imlay v. Union Branch Railroad Company, 26 Conn. 249, 260 (1857) (Emphasis added)
Neither sovereign immunity nor governmental immunity CT Page 306-II exists in these circumstances, either in law or in equity. See Laurel, Inc. v. State, supra, p 200.
This court concludes that the plaintiff does have a cause of action, in equity, by virtue of the doctrine of unjust enrichment.
 "Unjust enrichment is a very broad and flexible equitable doctrine . . . which has as its basis that `it is contrary to equity and good conscience for one party to retain a benefit which has come to him at the expense of the other party. When deciding a claim of unjust enrichment all the facts of each case must be examined to determine whether the circumstances render it just or unjust, equitable or inequitable, conscionable or unconscionable to apply the doctrine.'"
 Kimbrell v. Rossitta, 6 Conn. App. 628, 655 (1986)
The application of the doctrine does not require
 ". . . that the party unjustly enriched should have been guilty of any tortious or fraudulent act. The question is: Did he, to the detriment of someone else obtain CT Page 306-JJ something of value to which he was not entitled."
 Monarch Accounting Supplies. Inc. v. Prezioad, 170 Conn. 655, 665 (1976).
The Appellate Court, in the recent case Eastern MetalProducts, Inc. v. Deperry, 44 Conn. App. 60, (1997) has again clearly articulated the equitable doctrine of unjust enrichment.
 "Unjust enrichment is a very broad and flexible equitable doctrine which has its basis that it is contrary to equity and good conscience for the defendant to retain a benefit which has come to him at the expense of the plaintiff."
 Eastern Mutual Products, Inc. v. Deperry,
supra, p. 61, 62.
 Its three basic requirements are (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiff's detriment.
 Eastern, supra, p. 62 CT Page 306-KK
This court finds that the plaintiff's prayer for relief falls squarely within the principles so enunciated by the Appellate Court.
"Unjust enrichment applies when justice requires compensation to be given `for property or services' . . ."
Kimbrell v. Rossitta, supra, p. 638.
This court determines that the value of the materials and the service rendered in renovating the building are in the total combined amount of $248,500, which is the sum of the three construction mortgages given to the plaintiff, to wit $129,300 from Connecticut Housing Finance Corporation; $44,580 from the City of Hartford; $74,700 from the City of Hartford. The court does not credit the contention in Mr. Marselle's report, unsubstantiated that the actual cost of construction was $258,800. The court does accept Mr. Marselle's land value of $30,000. Hence the court finds that the total value of property and services rendered to renovate the building together with the land value is in the amount of $278,500.00.
This value of $278,500 is similar to Mr. Marsele's value of $288,000 which would have formed the basis of the court's CT Page 306-LL award had the court determined that inverse condemnation had taken place. Mr. Marsele used the total replacement cost for the entire structure, less substantial functional depreciation, plus land, to arrive at that valuation figure. Because of the vast disparity between market value based upon comparable sales, or based upon an income approach, on the one hand, and realistic costs of renovation on the other hand, the utilizing of a market value approach would in no fashion satisfy the requirement of "JUST COMPENSATION" as is required by Amendment V of the United States Constitution and ArticleFirst, Section 11 of the Constitution of the State of Connecticut.
The court orders that the defendant pay to and on behalf of the plaintiff the sum of $278,500 and that the property 17-19 Squire Street shall be transferred to the defendant free and clear of all mortgages, liens and encumbrances adjusted of course by the usual adjustments, (for taxes, fuel and the like) attendant to customary real estate closings. As the defendant has properly noted the three mortgages represent substantial sums due to other public agencies. These mortgages will be repaid from these proceeds. The court does not order or require that there be an accounting as concerns rental income which has been earned, nor shall there be any further sums paid to the plaintiff by virtue of any expenses CT Page 306-MM which may have been expended in the maintenance of the property.
The court does not award appraisers' fees or attorney's fees. The court does not award any additional amounts as "damages", requested by the plaintiff. Though a conveyance was not specifically requested in the complaint, "such other relief as the court does find just and equitable" is so requested. Such conveyance is specifically requested by the plaintiff in the court ordered post trial brief of the plaintiff filed November 7, 1996. The court finds for the defendant on the second and third counts of the complaint, misrepresentation, and therefore does not award damages.
Sullivan, L., J.